JORGE JUAN CABRERA, ETC., ET AL., Plaintiffs and Appellants, *v.* ASOCIACIÓN DE SEÑORAS DAMAS DEL SANTO ASILO DE PONCE, DR. JOSÉ FIOL BIGAS, COMMERCIAL INSURANCE Co., Defendants and Appellees.

No. R-66-32.       Decided December 16, 1968.

*Miguel A. Velázquez Rivera* for appellants. *Rieckehoff, Calderón, Vargas & Arroyo, Gustavo Rodríguez,* and *Francisco Parra Toro* for appellees.

Second Division composed of Mr. Justice Hernández Matos, as Chief Judge of Division, Mr. Justice Santana Becerra, Mr. Justice Rigau, and Mr. Justice Dávila.

PER CURIAM: Alicia Sotomayor Cabrera, married, and the mother of seven minor children, was hospitalized in the Asociación de Señoras del Santo Asilo de Ponce where Dr. José Fiol Bigas treated her for an eye infection. Part of the treatment to which the patient was submitted consisted in periodic applications of Ophthalmic Furacin drops in the sick eye.

By a mistake of an employee or employees of the hospital she was administered Otic Furacin drops from December 31, 7:00 p.m. to 10:00 p.m. every half hour, and thereafter, every hour, until the afternoon of the following January 1. As the names indicate, the medicine prescribed by Dr. Fiol is intended for application in the eyes, and the medicine which was mistakenly administered to the patient is intended for application in the ears.

There appear in evidence a bottle of Ophthalmic Furacin and another of Otic Furacin. Both medicines are produced by the same company and are bottled in containers having the same shape, size, and color, and their labels are also of the same color. They may be easily confused if care is not exercised. The nurse or employee who administered the medicine, as subsequently verified, did not know how to write the word ophthalmic.

The error was discovered because in the afternoon of January 1 the patient's husband went to visit her at the hospital and she complained that since the day before some drops were being administered to her, which drops caused her pain, a burning pain. The patient had complained of said pain to the nurse, but they continued administering the medicine to her. In the afternoon of January 1, while the patient's husband was in the room, they came to apply the medicine to her and she asked her husband, who is a pharmacist, to find out what kind of drops were those because they were burning her eye. Her husband immediately took the bottle from the nurse's hand and realized that they were applying Otic Furacin, a medicine intended for the treatment of the ears, but not of the eyes. Dr. Fiol was called, and he came to the hospital, took the bottle of Otic Furacin in his hand and emptied its contents in the washbowl and then delivered the bottle to a nurse who had come into the room.

It is convenient to explain that the opinion of the Superior Court induces to error in stating, in its finding of fact No. 10, that the bottle of Otic Furacin "had been left on the night table" by the patient's husband. Without any further explanation, it may imply that the bottle was taken to the room and left there by the patient's husband. That is not true. That bottle was not brought to the hospital by the patient's husband, but the nurse had it and, as we have said it was when she was going to administer the drops to the patient, that the latter complained to her husband of the pain that said

drops caused to her and then her husband took the bottle from the nurse's hand. He left it there in order that the doctor, who had been called, could see it.

The expert evidence indicates that the patient's sick eye was suffering a severe infection caused by staphylococcus hemolytic auric bacteria and that it is problematic whether the eye could be saved or not. The infection did not yield notwithstanding the intensive treatment to which the patient was submitted and the evisceration of the eye was necessary resulting in the total loss of sight. It cannot be determined either—as far as the expert evidence indicates and as far as we know—to what extent did the application of the mistaken medicine contribute to aggravate the condition of the eye.

The very company which prepares both medicines—the Norwich Pharmacal Co.—in a letter addressed to Dr. Fiol and Mr. J. M. Canals, explains that when the Otic Furacin is administered to an eye by mistake it should be thoroughly and quickly washed out.[1] From the expert evidence we can conclude that the mistaken application of Otic Furacin to a healthy eye, for a none-too-excessive lapse of time would produce irritation and discomfort, but not the loss of sight. It seems reasonable to us to assume that to a severely sick eye, like the patient's eye, said mistaken application should have produced more intense irritation and discomfort than in the case of a healthy eye and that to an unknown extent it probably aggravated the condition of the eye. We cannot

---

[1] Said letter as far as pertinent, reads:

"The dropping of Furacin Otic Solution in the eye was an incorrect use of the drug. When it occurs inadvertently, the eye should be washed out quickly and thoroughly with physiological normal saline solution. . . .

"It is believed that generally recognized experts in the field of ophthalmology will agree that the use of a hygroscopic agent in the conjunctival sac of the eye should be avoided. The package insert clearly states that the polyethylene glycol used as the vehicle is hygroscopic.

"Furacin Ophthalmic, an entirely different formulation, is intended for use in the eye. . . ."

conclude that the loss of the eye was solely caused by the mistaken application of the Otic Furacin.

We accept as correct that (1) the hospital employees mistakenly administered the Otic Furacin, (2) that said medicine not intended for said treatment caused considerable physical pain and considerable mental suffering to the patient when she became aware of what had happened and (3) that to some extent said contraindicated medicine for application in the eyes aggravated the condition of the sick eye. Therefore, we must conclude that, actually, damages were caused, for which the hospital and its insurer are liable.

Consequently, the judgment of the Superior Court will be reversed as to the part which dismisses the complaint in relation to the hospital and its insurer, and the defendant hospital and its insurer, the Commercial Insurance Company, will be ordered to pay solidarily to the conjugal partnership constituted by Jorge Juan Cabrera and his wife Alicia Sotomayor Cabrera, the following sums: $2,000 for medical expenses, hospitalization and medicines; $300 for transportation expenses incurred in relation to plaintiff's illness and $300 for the payment of expenses incurred for the care of the minor children of the couple while the plaintiff-wife was confined. One of the minor children was not one month old yet. The defendant hospital and its insurer will also be ordered to pay solidarily to plaintiff Alicia Sotomayor Cabrera the amount of $8,000 for damages due to physical and mental sufferings. Likewise, said defendants will be ordered to pay plaintiffs $1,000 for attorney's fees and costs. The part of the judgment of the Superior Court dismissing the complaint in relation to Dr. José Fiol Bigas, who acted diligently according to the evidence, will be affirmed.

Mr. Justice Santana Becerra delivered a separate opinion.

—O—

Separate opinion of MR. JUSTICE SANTANA BECERRA.

San Juan, Puerto Rico, December 16, 1968

My vote in the decision of this case does not imply the expression of opinion in relation to the amount of EIGHT THOUSAND ($8,000) DOLLARS granted to plaintiff Alicia Sotomayor Cabrera, according to the position assumed by me in *Robles Ostolaza* v. *U.P.R.*, *ante*, p. 570.